Case number 2016-4045, Nancy Roell as Executrix of the estate of Gary L. Roell Sr. v. Hamilton County, Ohio Board of County Commissioners et al. We're going to have to exceed 15 minutes per side. Mr. Gerhardstein for the appellant. Good morning. I'm Al Gerhardstein. I'm here on behalf of Nancy Roell and the Roell family. I reserve three minutes for rebuttal. The district court erred in this case by deciding three material facts that should have gone to the jury. First, was Gary Roell an immediate threat to the officers who confronted him? Second, was there an opportunity to reasonably accommodate his mental illness by verbally de-escalating with him before they went hands-on with tasers and wrestling with him for four and a half minutes? And third, was the court right to decide the cause of death when there was a contested issue of fact as to whether this extreme use of force by the officers contributed to his cause of death? And what's the context for at least the first two of these issues? The context is a very familiar formula that this court has used repeatedly. That is Graham v. Connor. And remember, even though we talk about Graham in every use of force case, Graham itself involved a plaintiff who is having a hypoglycemic episode. So when we look at the formula for determining if use of force creates a constitutional violation, we always say it's the interest of the government in accomplishing the arrest balanced against the intrusion on the personal interest of the suspect. And we look at the totality of the circumstances and particularly at whether the seriousness of the crime, whether there is an immediate threat to the officers or the public, or whether the suspect is acting to actively resist or is fleeing. Is the counsel undisputed? I thought in my reading of the record it was undisputed that this individual went aggressively at the officers. And that's a great question because that's a loaded word that officers use all the time when they want to justify their force. When they first confronted Gary Rohl, he didn't do anything. He was standing there. There was a window four feet up off the ground. He was surrounded by a four-foot fence. When they first confronted him, they were aware that they were called by the neighbor. And when the call from the neighbor let them know that Mr. Rohl had thrown a pot of flowers or something through her window, that's how she knew he was around, right? Well, they didn't actually know about that yet, but they could see that there was broken glass on the patio that was surrounded by the wood fence. And they could hear him saying babbling words about water. And he's holding a hose. He wasn't quite right. Right, right. So at some point, does he obey any of their commands? Yes, he did. And before they started giving commands, they had an opportunity to de-escalate and they didn't do it and we should have a trial on that. Are they obliged to take the course of action that, in hindsight, one would view as preferred? Are they obliged to do that by the law? We don't use hindsight. We use the facts the officers knew at the time. And at the time, they knew that all he was doing was standing there babbling. So they had an opportunity to verbally de-escalate. That's my question. They had an opportunity. Does the law oblige them to take that opportunity? Absolutely. He's a mentally ill person. They have to reasonably accommodate his mental illness. They don't know his psychiatrist, do they? Or any of his doctors? You're saying he's a mentally ill person. Martin v. Broadview Heights says they have a duty to do some verbal de-escalation. Obviously, it's only when they completely do it. None of that was done. No effort to say, calm down. Right. None? Nothing. None. Absolutely. All they said was, show me your hands. Come over here. Get down. And they're all yelling at once. Did he comply with those orders? Yes. He started coming toward them in response to show me your hands. And they knew that that was not aggressively. They knew that. That they knew that his coming toward them with the hose, with the metal end, was compliant. And Officer Alexander knew that for sure because they all saw him drop the hose before he ever got to them. Okay. And he's coming at them, and they had an opportunity to de-escalate. They didn't do it. As he's coming at them, they're all barking at once with these loud orders, the absolute opposite of what they ought to be doing. And then they tase him. I know the counsel from the other side is going to stand up and say, this is not quite the way she read it. And I'm saying that that's what a jury should decide. Okay. Because we have witnesses. No, I'm saying she's saying the record, which is what the district court looked at. Right. And the district court erred by failing to take into consideration the order to Gary Roll to come to them, his compliance. And then most importantly, as he's moving toward them, he says, I don't have a weapon. So even though he is delusional about the water, he's anchored enough in reality that he knew, I better tell them I don't have a weapon. There's something there to reach if you want to talk to him, just as Nancy Roll had done through the 18 years of their marriage. And there's something there to reach if you want to just give it a try. Seven to ten percent of it. I don't want to give it a try. I keep going back to that question. I think it's Shaheen is the case that says thou needn't try. Well, actually, Shaheen was remanded from the Supreme Court on the ADA claim. And on the 1983 claim, they gave qualified immunity on totally different facts. That mentally ill person had a knife. And she was saying, I'm going to kill myself and I'm going to kill you, to her caregiver. Distinguish it. All right. Totally different set of facts. Martin explains the test which was drawn from Champion, that the officers are required to deescalate the situation and adjust the application of force downward when confronted with a mentally unstable person. Correct. And Martin was actually a person suffering from excited delirium, just like Gary Roll was. So it's very relevant. They did use excessive force in Martin, didn't they? There was compressive body weight, head and body strikes, chin and neck restraints, torso locks. And he died of asphyxiation, didn't he? They did use more force than they used in Gary Roll. But in Gary Roll, they used the taser twice, once to the chest. They used drive stuns repeatedly. Neither worked. And they wrestled with him. That's correct. And they wrestled with him for four and a half minutes, all of which is foreseeable with excited delirium. If you have not succeeded in verbal de-escalation, they were even taught through, it was a roll call training, they were taught that they should get six officers present so that they could quickly subdue him and have EMS staged. The coroner said he died of natural causes, didn't it? That's what the coroner said, but the coroner also said that this was after a police altercation and after the use of an electric control device. So Dr. Smith, who trains officers in dealing with mentally ill people, said that those contributed to the death. And the coroner's report itself is argument that it contributes to the death. But I want to just caution. We disagree with the court making a finding on cause of death, but as this court said in Champion, and it was Judge Moore writing for the panel, even if Champion had not died but had only been injured, his clearly established rights were no less violated, reminding us that you can have excessive force even if it doesn't kill the person. And that's important. But here, obviously the cause of death is going to be important in this case, and it shouldn't have been decided by the judge. Are you familiar with this 2014 decision of the Sixth Circuit called Cook v. Bastin? No. And I'm sorry, I wish I was. It's an excited delirium case with deputies and Fourth Amendment rights, and the court held that there was no clearly established right. Well, if you just look at Martin, which is 2015, and Martin was a 2000, Martin the encounter occurred in 2007, and the decision was 2015. 2013, I think, Martin. But at any rate, Martin, yes, right, 2013, later in 2013. But the encounter was 2007, and they denied qualified immunity to the officers for failing to verbally de-escalate, for failing to de-escalate the force on a person suffering from excited delirium. Facts matter in these cases, and there are cases where you can't do it. I mean, like Sheehan, where the suspect's coming at you with a knife. There's not much you can do. Or the suspect has a gun. But even in gun cases, this court and the Supreme Court will look at whether the gun's pointing at the person. Think about all the SWAT cases we've had. Isn't the law that as long as it is objectively reasonable to try to subdue versus try to de-escalate? Both are objectively reasonable actions by police officers confronted by a disturbance in a neighborhood. The issue is whether it's objectively reasonable. I totally agree. Who decides that? If it's a question of fact. I said that I wanted you to look at the counter. It's objectively reasonable to try to subdue, which doesn't mean try to kill, and it's also objectively reasonable to try to de-escalate. Each comports with the law. No, you cannot just go hands-on and skip an opportunity to verbally de-escalate. Okay. That's where I think we have the most distinct disagreement. And that's where I think we should be guided by Champion. It's not our disagreement. It's the reading of the law. I understand. And I think that Champion and Martin direct us to a duty to verbally de-escalate, where possible, before there is this hands-on encounter. And I would simply say that that's also a function of the ADA claim, which the court improperly dismissed. There should be a reasonable accommodation to mentally ill suspects. What's your best case to say that that ADA duty to accommodate applies in an arrest situation? Well, we'd have to go to other circuits, which are in the brief. In this case, you've recognized the reasonable accommodation claim in Anderson, Andy, and Ability Center of Greater Toledo. But there are a number of circuits that have ruled that it also applies in the arrest context. There are a number of circuits that say it does not apply in the arrest context. It's an open issue. But given that this court has accepted the reasonable accommodation argument and that in this instance the reasonable accommodation is simply a policy that should be in place when you can safely use it to verbally de-escalate, I think given that it affects 7% to 10% of every police encounter, that's exactly what the law requires under the ADA. I'd ask that you reverse the summary judgment as to all defendants and remand the case for trial. Thank you. Good morning, Your Honors. May it please the Court. There's a lot to respond to. First of all, there are no material questions of fact that bar qualified immunity or summary judgment in this case. I'd be happy to speak to the two questions of fact that Mr. Gerhardstein has identified in his briefing as well as in his reply below to the Court, namely that there is some issue as to whether or not the officers had observations of Mr. Rule from which a reasonable police officer could perceive a threat of harm. And then secondarily, whether or not there is testimonial evidence in this case that suggests that the officers dispute Soham Agrawal, one of the eyewitnesses' testimony as to what he heard being screamed. But let me just set this. This is your unqualified immunity, right? I beg your pardon, ma'am. This case is here on qualified immunity grounds? Yes, ma'am, it is. So don't you have to accept the facts as alleged by your opponent? Yes, ma'am, I do. Okay, and that's my point. The record evidence in this case with regard to what actually occurred is that Soham Agrawal and Rakhna Agrawal, his mother, who's the person who dialed 911 because her neighbor was in her patio at 2.30 in the morning, awakening them when he threw a pot through the window, whom she confronted, who threatened her and she was afraid of him, so she ran into the house and called 911, and her 18-year-old son. They testified in this record, Your Honor. Not only did they testify in depositions, but they gave statements immediately after the occurrence as to what they recall. Soham Agrawal specifically at RE91 page ID 3861 testified in his deposition upon my inquiry, I think perhaps Ms. Weber's inquiry, I can't remember now. What else do you recall the officer saying? I don't recall. This court has strong case law suggesting that the lack of record evidence cannot be the basis for a denial of qualified immunity or summary judgment. So in this case, you had three officers and two eyewitnesses testifying as to what they recall being said and having heard. The officers don't dispute that they said, come here. So we're not here arguing that the court should disregard Mr. Agrawal's testimony, that he heard that. What I'm suggesting is the fact that some people remember certain things being screamed and said in a rapidly evolving encounter, and some people remember other things, doesn't mean that the things that I don't recall being said weren't said, and there's case law in this circuit on point for that. It was plain to the officers, was it not, that they were confronting a person with some mental difficulties at the very least. It was clear to them that this gentleman was, I mean, out of control and babbling, I gather from the record that he was babbling and maybe talking about water, but they knew he wasn't right at the moment. That is the cogent inquiry, actually, particularly in light of White, Mullinex, and Sheehan. We have to particularize, so if I could respond. In fact, what the record evidence is, is that these two officers came around the corner. They saw Mr. Roll. They said, hey, what are you doing? Within two seconds of viewing him to five seconds, he started coming at them. Now, like any good trial attorney, I didn't just rely on the officer saying he was aggressive, he was combative. Rather, like any good trial attorney, what I asked them was, what was it about Mr. Roll's affect that caused you to perceive him as aggressive and combative? Judge Cook's question, which is a question that I share, is wasn't it obvious to the officers that Mr. Roll was mentally unstable at the time? And one fact that hasn't been mentioned, he was naked from the waist down. He was waving a hose, babbling about water. This is not the action of someone who is mentally with it. So don't you have to answer that question, yes, it was obvious to the officers that there was some mental health issue for Mr. Roll at that point in time? Well, you see, Your Honor, that's the rub. At what point in time? So perhaps I should have been more clear. No, yes. No, when they came around the corner and said, hey, what are you doing, and he comes at them. Yes, when they got him under control. By that time, they had had an opportunity to observe him, to hear him. But when they first came around that corner, and the record evidence is clear. Please, don't rely on me. There is record evidence in this case by the officers that they did not have an opportunity to observe his mental health status prior to his coming at them. And it was only over the course of the incident that they came to the conclusion that I would agree with you, that there was something wrong. But I would point you to their expert's deposition, Exhibit 6, to Dr. Smith's deposition, where Dr. Smith details 30 medical conditions that can mimic excited delirium and details in a colloquy with me, dehydration event as a result of alcohol withdrawal, which entirely mimics excited delirium. How does that make a difference? If somebody is suffering from something other than excited delirium, but is causing these kinds of symptoms that make them act irrationally? Well, it was in response to plaintiff's theory that the officer should have known he was having an excited delirium. And because they should have known, they should have known. Calming him down would work. Yes. De-escalation. Yes. Now, what's intriguing about this record is he actually wasn't having a mental health crisis at all. He was having a medical episode of excited delirium, which is a physiologically caused, induced situation. This would be like you could calm down someone who's in diabetic shock, because they could cognitively overwhelm their physical condition by just some nice talking to them. So I asked their expert, so are you telling me, Dr. Smith, when they came around that corner they should have said, Gary, how can we help you? Well, yeah, that's what they should have done. I said, are you telling me that everything about this incident would have been different as a result of that? Well, no, that's not what I'm saying. So when these officers first observed Gary Roll, they had no idea what exactly was going on. He determined the level of force here. And can we just admit that the level of force here was minimal? The district court did not find this was a serious threat, a severe threat, an extreme threat. There are a lot of cases with that kind of conduct. I mean, I think that Cook and – Correct. I can't help but have wonderment at the Marsau case that's cited in plaintiff's brief from Oregon, where the subject fell out of a two-story window, was severely injured, and the officers responded by shooting him seven times with a shotgun, less lethal, whatever that means, using six cans of pepper spray, sitting on top of him in a maximum restraint position, and he died of asphyxiation. In the context of White, Mullinex, and Sheehan, the challenge for the district court, which she met, and the challenge for this court, DeNovo, is to particularize this situation in the scheme of context. And with all due respect, I have to at least quibble with one aspect of the characterization of the Martin case. In that case, if you read the opinion carefully, the plaintiff offered an expert that said, you know what, you should have verbally intervened. And Judge Stranz, writing for that court, did not adopt that position. What she said was when someone is obviously mentally ill, you have a duty to de-escalate the force in commensurate with the threat that that person poses. We're still operating under a totality of the circumstances scenario. And I'm not aware of any case in this circuit or in the United States Supreme Court that suggests that because someone's mentally ill or because they are having a medical condition, that the officer is to disregard his perception of force. Now, I would also say that I think it's a gross mischaracterization of the district court's analysis in this case to characterize it as improper fact-finding, particularly in light of, again, Sheehan, Mullenix, and White v. Pauley, which calls upon the court to particularize the situation. Plaintiff's counsel said that the record shows that Mr. Roll dropped the hose as he approached the officers. Is that what your recollection of the record is? Yes. Thank you for reminding me of that. Because what counsel neglects to tell you is that R.E. 77 at page 506, which is Officer Huddleston's deposition testimony, what he testifies is that when Mr. Roll got to them, he was swinging that planter as if to hit him in the head. So that kind of begs the question as to whether or not there was enough prior to dropping the hose that would allow a reasonable police officer to perceive a threat of harm, as the district court said, more than minimum but less than extreme. I would argue, to your honor, that even if he dropped the hose, there was enough record evidence to support a reasonable officer having that. What kind of a planter was it? I thought it was a moss plant. Yes. As opposed to a planter being a hard object. Yes. I'm a gardener. You have to have something to keep that moss in that planter. Something you know factually. I don't know. You're right, your honor. It was described as that. So I'm not here to say that it was a gun or a knife, but I'm also not here defending a deadly force case. I thought there was a concession in the record that it was undisputed that Mr. Roll was going at the officers aggressively. I thought it was undisputed that there was a concession about that, and that he did not obey the commands to drop the weapons, either the hose or the plant. He did not obey the commands to drop the weapons. Is that undisputed? In my view, the record is undisputed, but in all fairness, Judge, I can't say that there was a concession, specifically conceded that. I can't say that. I thought the hose was dropped. I believe that Officer Alexander testified, not that it was dropped, ma'am, but that by the time Mr. Roll traversed the patio and got to where they were, he was no longer holding the hose. There is no testimony that… He carefully placed the hose down on the ground, then, instead of dropping it. I don't know. This approach by Mr. Roll happened in a matter of seconds, so there are certain finite features that I can't say are present in the record, and that may be one of them, exactly how the hose left his hand. I don't think there's any record evidence that can help the Court with that piece. But what you're saying, though, is that when Mr. Roll got close to the officers, he no longer had the hose in his hand. According to Deputy Alexander's testimony, that is, in fact, correct. And that is a fact that's in favor of Mr. Roll, so we have to take that as… I'm not disputing it. I mean, if that's what you're asking me, I'm not. I'm trying to see where the difference of opinion is between you and your opponent and try to figure out where the law should go in this case. You mean factually, ma'am? I mean in its entirety. So your argument is one factor that we take into account, but we also take into account your opponent's argument and the briefs and so on. So what I'm trying to figure out, then, is looking at the facts in the light most favorable to Mr. Roll, which we're doing on this case at this stage, Mr. Roll has no longer possession of the hose. He's either dropped it or he has placed it carefully on the ground. He has in his hand, I believe, please correct me if I'm wrong, he has in his hand a moss-covered plant. Yes. And at that point, why do the officers not have the opportunity to talk to him and to try to diffuse him? Because the record evidence will indicate to the court at that point, Mr. Roll is right here, and they are in arm's reach of him. He is swinging that plant at them, and then what do they do? They grab him and subdue him. But at that point in the confrontation, I'm wondering about the duty to subdue, to protect everybody around. Correct. And so there's the neighbors. I mean, initially, you want to subdue somebody who's apparently out of control, for a lot of factual grounds exist to say that Mr. Roll was not in control, and subduing him had to do with protecting not only the officers but the neighbors around. I mean, subduing doesn't mean hurting, but in this case, his resistance caused, I don't know, it was his condition, who knows what quite did it. Right. Well, that is also a problem in terms of causation, when arguably the expert in the entire country, and his declaration is in this record, indicates to the court that no one really knows why some people die in these scenarios and some people don't. And, in fact, both of Plaintiff's experts admitted that, that some people die, some people don't, no one knows why. Some people struggle with police and live. Some people aren't struggling with anyone and get the requisite degree of acidosis, they think, in their bodies to cause these three physiological conditions. I kind of, in my mind, see it like a whirling dervish of respiration, heart rate, and core body temperature. And there's, frankly, no one in this country that can opine to you exactly what happens. I'm probably out of time. I always get so engaged with you guys that I don't pay any attention to these lights here. I apologize. Tell me about the Plaintiff's ADA claim. Is there a duty to accommodate in this situation under the law? No. And I don't. What authority do you cite us for that? Well, Your Honor, I believe that at this point there is law on either side of that issue. I think the more compelling law is that law that would suggest that in an arrest situation, there is no duty to accommodate because of the very nature of the. . . Well, suppose someone is being arrested and they have clearly some shoulder, elbow, arm problem that makes it extremely hard for them to be handcuffed behind their backs. Wouldn't the Title II of the ADA require an accommodation to that physical disability that that person clearly has? I would suggest that at the time someone is handcuffing, either they have already been under control. But are you suggesting a scenario where someone is fighting with someone? I'm asking, does Title II apply to that situation? You can try to elaborate the facts, but the legal question is, does Title II apply of the ADA? I don't believe that I can give you a cogent answer to that question without incorporating facts. Does Title II ever apply? I was trying to come up with a pretty obvious example. A scenario when it would. I could see an argument for that, Your Honor, if, for example, we've controlled someone and now we're getting ready to put the handcuffs on that person. So you're saying it really depends on the facts whether Title II applies then? In reading the cases, it seems to me that the courts have said in an arrest situation that's rapidly evolving that there's no application. So now you're changing your answer and saying it's a legal matter that Title II would never apply. You know, I don't know. I don't think it's clear. I think there's case on either side. I can see. I really can't see what you're saying. It would be bad for us to say as a matter of law, Title II never applies in an arrest situation because even you are conceding that it could apply in some arrest situation. Well, I guess if you're saying that putting someone in. If you're waffling on it, you have to be saying there's something that's bothering you about the blanket statement that Title II doesn't apply. It's sort of like teaching the class that I teach and adding facts in or taking facts out as lawyers. We can add facts in or we can take facts out that make us uncomfortable with some bright line. So that bright line, I feel like I'm in law school and you're making me uncomfortable with that bright line. I guess my only response is that's what we do as lawyers. I mean, there are bright line rules of law. Are you advocating a bright line rule here or not? I'm not sure at this point. Judge, you've kind of talked me into that gray area. I can't help but think of the facts of this case when I'm answering that question. I don't think the argument posed by the plaintiff here asks for a bright line rule, do they? No. I don't think so. No, they're asking for the application of that in this context, in this factual context. And there I'm more than confident telling the court that I believe that in this case the ADA application on a pre-arrest is not appropriate. Could I just end by pointing out a couple things to the court? No, your red light has been on for quite a while. Okay. I would just ask the court in conclusion then to look at plaintiff's deposition toward the end, where she actually concedes and admits many of the features that plaintiff's brief contests at this point. Thank you very much for your time today. Thank you. The good news is that we're talking facts, and this is a summary judgment appeal. And with so many contested facts, it's clear that there ought to be an opportunity. In every summary judgment case, many of which this court affirms, facts matter, right? It doesn't make it a jury issue. If they are material facts, sure, it's going to be a jury issue. And the whole issue here is whether these are material facts. Disputes of material facts, right. That's right. And when they first saw Gary Rohl, and he was doing nothing other than standing there, and they chose to initiate by yelling to him rather than speaking softly. Wait a minute, he was doing nothing but standing there? Yes, holding the basket. Naked and having been called by the neighbor, right? Right. Is that just standing there? Well, don't forget that even in these rapidly evolving, unfolding situations. He's talking? Yes, he's babbling. He's babbling about water. Okay, so he's naked at the waist. Right. He's talking. Right. Babbling. Right. He's committed some kind of bad, or he hurt the house. And just as you had asked. The neighbors are upset. Opposing counsel, it's clear that something's off. Yeah. And so how are they, so the question is, how are you going to go after somebody like this? Do you go hands on, or do you start talking first? And that's issue number one. That should be decided by a jury. And then my opposing counsel said, well, he's already suffering from excited delirium, and therefore we know what the outcome's going to be. He's just going to die. Well, we actually don't know that, and that's a contested issue as well. He had schizoaffective disorder. He became delusional as a result of schizoaffective disorder. He's suffering from that as he trashes his condo and trashes the mailboxes outside with litter and dirt and things, and as he's babbling about water. At some point, it becomes excited delirium. Is that at the point after they've started wrestling with him or not? I don't know. But a jury could help decide that. And then the court talked about the basket. The basket's pictured in the record at 77-1, page number 785, as a moss-covered basket. And the other thing that hasn't been mentioned yet is as he came toward the officers, he said, I don't have a weapon. So, again, there's an opportunity. And this reminds me of the Landis case where we have a mentally ill person moving construction equipment around, and then when the police try to apprehend him, Landis v. Baker, they grab him and he chokes an officer. But he's clearly mentally ill, and then he runs off again. And then when they apprehend him for a final time and he's in the puddle and his face is in the water, the court's saying, you know, we knew that he was mentally ill. The officers should have taken that into consideration as they continued to use force on him. Again, these are all facts that we should consider. This is a dynamic situation. After he was first tased, Gary Roll crawled back into this pen, this patio that was surrounded by a six-foot wood fence. The officers had an opportunity right then to say, hmm, this is not working very well. Maybe we should talk before we just go after him. They chose not to do that. That should be part of the trial. Thank you very much. Thank you. Thank you both for your argument. The case will be submitted.